# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| MICHAEL TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 12-2210-KHV |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

Michael Turner seeks review of the final decision of the Commissioner of Social Security to deny Social Security disability benefits and Supplement Security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq. For reasons set forth below, the Court finds that the final decision of the Commissioner should be reversed and remanded for further proceedings.

## I.    Procedural Background

On December 16, 2008, plaintiff applied for disability benefits, alleging disability since January 11, 2003. Plaintiff filed prior concurrent applications for benefits on April 14, 2006, which the Commissioner denied on September 15, 2006. The ALJ found no basis for reopening the prior applications and res judicata therefore prevented the ALJ from considering whether plaintiff was disabled prior to September 16, 2006. See Tr. 13. The relevant time period in this case thus begins on September 16, 2006. In addition, plaintiff's insured status under Title II of the Act expired on

---

    [1]      On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as defendant in this suit.

June 30, 2008.[2]  Tr. 14.

The agency denied plaintiff's application initially and upon reconsideration.  Plaintiff requested a hearing.  On December 10, 2010, plaintiff appeared with counsel at the hearing before Administrative Law Judge ("ALJ") Susan Blaney.  On April 28, 2011, ALJ Blaney found that plaintiff was able to perform jobs that exist in the economy and therefore was not disabled within the meaning of the Act.  Doc. #11-4 at 27-28.  On February 13, 2012, the Appeals Council denied plaintiff's request for review.  Thus, the ALJ decision stands as the final decision of the Commissioner.

## II.    Facts

The following is a brief summary of the evidence presented to the ALJ.

### A.    Plaintiff's Testimony

Plaintiff was born on June 4, 1968.  He has a high school education and additional  training. Plaintiff testified to the following facts:

Plaintiff injured his back in June of 2002 while working as a certified nurses aid.  Although he went back to work, he was fired in January of 2004 and he has not worked since.  He is not able to work because of mental problems including depression and anger issues and physical problems including back and leg pain.

---

[2]    To be entitled to disability benefits under Title II of the Act, plaintiff had the burden to show that he was disabled before his insured status expired on June 30, 2008.  See Tr. 14; 20 C.F.R. § 404.130; see also Washington v. Shalala, 37 F.3d 1437, 1440 n.2 (10th Cir. 1994).  To be entitled to supplemental security income under Title XVI of the Act, plaintiff must show that he was disabled while his application was pending.  See 42 U.S.C. § 1382c; 20 C.F.R. §§ 416.330 and 416.335.  Thus, the relevant time periods for consideration in this case are from September 16, 2006 (the date after plaintiff's prior denial of disability benefits) through June 30, 2008 (the date his insured status expired under Title II), and from December 16, 2008 (the date he filed his Title XVI application) through April 8, 2011 (the date of the ALJ decision).

Plaintiff takes trazodone for depression and anger, Remeron for appetite and depression and Zyprexa for bipolar disorder. He has constant pain in his low back which radiates to his legs. Tr. 49-50. Plaintiff takes flexeril to relax his muscles and Tramadol and hydrocodone for back pain. The pain medications are somewhat effective, but he continues to have back pain. The pain medications cause him side effects including blurred vision and lack of concentration. He often has problems obtaining pain medication.

Plaintiff has tried various treatments for his back, including aqua therapy, physical therapy, traction, TNS unit and epidural steroid injections, but "nothing worked." Tr. 62. Although doctors have recommended surgery, plaintiff has declined because of the risk.

Plaintiff has balance problems, can only stand for two to five minutes at a time, and cannot squat, crouch, crawl, stoop, kneel or bend. He has some problems with bladder control. He gets dizzy or lightheaded about four or five times a week for about 15 to 45 minutes. His hands go numb and shake about every other day, and he frequently drops things. It is painful for him to turn his head side to side, and very painful to point his head down.

Plaintiff lays in bed for 13 to 14 hours a day. The rest of the time he sits or goes back and forth between the bed and the couch. He does not do any cleaning or cooking, and does not drive because he can't get into his pickup truck. He goes out of his house about five or six time a month. Plaintiff does not go anywhere without his fiancé for fear he will get in trouble and end up in jail.

The ALJ asked plaintiff about a statement that he had allegedly made to his psychiatrist in 2009 – that he could do push-ups for two hours and that he raked leaves for 14 hours straight. Plaintiff responded that he could no longer do pushups because of his back, and that he had never told his psychiatrist that he raked leaves for 14 hours straight.

Plaintiff began drinking in November or December of 2003, after he injured his back. When the ALJ asked plaintiff about his conflicting response on a 2009 questionnaire – that he had started to drink and use drugs in 1990 – plaintiff responded that "when it comes to trying to remember all that, I can't do it." Tr. 70.

Plaintiff testified that he last used drugs and alcohol in October of 2005. Tr. 46, 57, 71. When asked about his therapist's statement in 2008 that plaintiff needed to be sober and not use illegal drugs in order to obtain housing, plaintiff said, "that's not accurate" – that he was not taking illegal drugs in 2008. Tr. 44-45.

### B.     Tracy Bennett's Testimony

Tracy Bennett, plaintiff's fiancé, testified to the following facts:

Bennett has lived with plaintiff for the past year and a half, and she has known him for ten years. He has big knots in his back so that he cannot bend or pick things up. His legs and hands go numb and he drops things. Plaintiff takes pain medication when he can afford to, but sometimes he can not. Because of his physical condition, he cannot do any yard work or house work. Bennett and her daughter do all of the housework. Plaintiff does not drive.

Plaintiff has trouble controlling his anger, gets frustrated over "any little thing," and throws things, hollers and curses for up to 30 minutes or more. Tr. 73. He can not sleep for more than a few hours at night. She does not feel it is safe for plaintiff to go out alone, because she doesn't know if he will hurt himself or "get into it" with someone and hurt them.

Plaintiff has a short attention span, poor memory and can not keep a schedule. Plaintiff can not manage money. Bennett does not believe that plaintiff could live independently.

### C.    Medical Evidence

#### 1.    Physical Impairments

On June 15, 2002, plaintiff injured his back while working as a nurse's assistant. A Magnetic Resonance Imaging ("MRI") scan performed on April 9, 2003 revealed degenerative disc disease at L4-5 with small posterior annular tear; grade I endplate changes; and L5-Sl disc space narrowing with disc desiccation and small focal annular tear. Exhibit lF at 126. An electromyography performed on April 19, 2003 showed abnormal electrodiagnostic study of the lower extremities displaying changes consistent with chronic right L4 and L5, as well as left L4, L5 and Sl radiculopathies. Exhibit lF at 120. On July 1, 2003, Dr. Robert Henderson scheduled plaintiff for an epidural steroid block. Dr. Henderson later recommended a two-level discectomy and fusion at L4-5 and L5-S1.

On March 8, 2005, Dr. David Wilhoite, an orthopedist, evaluated plaintiff and found no apparent motor or sensory deficits in the lower extremities. Plaintiff's straight leg test was normal in the sitting position. He diagnosed degenerative disc disease L4-5 and L5-Sl. Doc. #11-11 at 42-43. Dr. Wilhoite found that open surgical intervention was not indicated, but that an intradiscal electrothermal annuloplasty procedure at L4-5 might be considered.[3] Dr. Wilhoite stated as follows:

> Mr. Turner has very equivocal findings on his physical examination. One would expect a markedly positive straight leg raising with somebody with as limited motion as he demonstrates. I feel there is a great deal of overlay related to this injury. I also understand that he is trying to get into rehab for his crack cocaine habit. This certainly would need to be treated before any type of surgery was contemplated.

Id. at 43.

---

[3]    Intradiscal electrothermal annuloplasty is a minimally invasive alternative treatment for lower back pain due to disc problems.

On May 23, 2006, Dr. Richard Brown interpreted a nerve conduction study as normal, finding no radiculopathy.  Doc. #11-11 at 20.  In June of 2006, however, a clinical exam revealed severe muscle spasm, decreased range of motion, and straight leg raising of 30 degrees on the right and left.  Dr. Daniel Metzger approved plaintiff for surgery in June of 2006, but plaintiff cancelled after expressing concern about being cut "in the front and the back."  Doc. #11-11 at 18.  In October of 2006, plaintiff saw his doctor again and reiterated he did not want surgery.  A clinical exam showed severe muscle spasm, decreased range of motion and a positive straight leg raise at 30 degrees.

After a significant lapse in treatment, plaintiff went to Swope Health Wyandotte for back pain assessment on January 15, 2009.  See Doc. #11-14 at 38.  He rated his back pain eight out of ten without medication and five out of ten with medication.  The medical provider prescribed Lortab, Meloxicam and Cyclobenzaprine.   Plaintiff completed a medication management agreement and required urine drug screen.  On February 20, 2009, when plaintiff returned to Swope Health for pain and depression medication, he demonstrated strong upper extremities and lower extremities and full range of motion in the lower extremity and no muscle atrophy.  Doc. #11-15 at 25-26.

On March 11, 2009, Ira Fishman, D.O., examined plaintiff.[4]  Doc. #11-14 at 75-78.  Plaintiff reported aching pain in his upper, middle and lower back and in his leg muscles.  Id. at 76.  Plaintiff stated that he could not tolerate any activities that required sitting, standing, lifting or bending.  Id.  A physical examination revealed 5/5 motor strength at the upper extremities, 4/5 motor strength limited by pain in the lower extremities, and limited range of motion in the lumbar area.  Id. at 77.

_____

[4]        Dr. Fishman conducted the examination at the request of the Kansas Department of Social and Rehabilitation Services ("Kansas SRS").

Straight leg raising produced complaints of lower back pain at 15 degrees on the right and 20 degrees on the left. Id. Plaintiff walked with antalgic gait favoring his lower extremities, but did not display evidence of ataxia. Id. Although plaintiff complained of lower back pain with light compression in the lower lumbar paraspinals, Dr. Fishman found no evidence of significant paraspinal muscle tightness or trigger points with exam of the spine. Dr. Fishman stated that it was difficult to determine if plaintiff actually had evidence of an ongoing lumbar radiculopathy due to his exam being somewhat pain limited. Id. at 78. A lumbar spine x-ray revealed moderate disc space narrowing at L5-Sl, and mild anterior endplate osteophyte formation at L5-Sl. The sacroiliac joints were normal, and plaintiff showed no evidence of loss of vertebral body height. Doc. #11-14 at 73.

Dr. Fishman opined that plaintiff is subjectively limited by back pain in his ability to tolerate work activities involving lifting, carrying and handling of objects as well as frequent bending, kneeling, stooping, and squatting, and prolonged walking, standing and sitting. He found that plaintiff did not need an assistive device to ambulate.

On July 20, 2009, plaintiff was examined at Swope Health. Doc. #11-15 at 35. He reported an irregular heartbeat. His examination was normal except for palpations. When he returned in September of 2009, his hypertension was controlled and his electrocardiogram was normal. Id. at 45-47. On March 4, 2010, plaintiff returned to Swope Health and reported that he had back pain radiating down both legs. His neurological and extremity exam was abnormal; he was unable to complete stretch exercises bilaterally. The provider prescribed Flexeril and Tramadol.

On March 18, 2009, Ester Strobel, a state agency Single Decisionmaker, completed a Physical Residual Functional Capacity ("RFC") assessment. Doc. #11-14 at 82-90. She found that

plaintiff could perform light exertional work but could not climb ladders, ropes or scaffold, and was only able to occasionally stoop, kneel, crouch and crawl.  Id. at 84.  She also found that plaintiff had limited ability to reach in all directions.  On July 24, 2009, Gerald Siemsen, M.D., a state agency medical consultant, reviewed the record and confirmed this RFC.

### 2. Mental Impairments

In December of 2005, John Macchietto, Ph.D., L.P.C., of the Bryan Avenue Clinic of Mental Health and Mental Retardation in Tarrant County, Texas ("Bryan Avenue Clinic"), provisionally diagnosed plaintiff with major depressive disorder with psychotic features and substance abuse. Doc. #11-19 at 29.  Plaintiff had just completed a 30-day drug rehabilitation program for use of methamphetamine and cocaine.

In January of 2006, a psychiatrist at Bryan Avenue Clinic officially diagnosed plaintiff with severe major depressive disorder without psychotic features, as well as alcohol/crack cocaine dependence.  Doc. #11-14 at 24.  He complained of depression and poor concentration.  Plaintiff reported using crack cocaine since the age of 21, but reported that he had been sober since November 25, 2005.  He reported being homeless off and on since 2002, when he lost his job due to a back injury.  He reported a history of physical altercations with various people including significant others.  Plaintiff was taking Zoloft, which he complained was not working.  The psychiatrist increased the dosage of Zoloft and added Benadryl.  Id.  The following month, plaintiff reported that his medications were working well for him.  Plaintiff was bright, verbal and cooperative in group therapy.

At a psychiatric appointment on September 6, 2006, plaintiff reported feeling more depressed and having problems with being able to sleep.  He had recently broken up with his girlfriend.

-8-

Plaintiff had self-discontinued his psychotropic medications. Doc. #11-13 at 39. His thought process remained normal and he reported sobriety of 11 months.

In February of 2007, plaintiff went to John Peter Smith Hospital in Ft. Worth Texas because he had stopped taking his medication, gotten very angry and kicked in his cousin's door. He demanded to see a doctor immediately so he could get medication. When staff told him he would have to wait, he became threatening. Staff called police and gave plaintiff Haldol, Ativan and Benadryl for agitation. Plaintiff reported that he cannot control himself when he is off his medication. His mental status evaluation revealed appropriate affect, depressed mood, good concentration, intact long and short-term memory, normal intellect, and concrete and logical thought processes.

In March of 2007, Bryan Avenue Clinic terminated services to plaintiff because he did not keep appointments and had been out of services for more than 30 days. Doc. #11-17 at 22. He returned in August of 2007, stating, "I need to balance my life and learn how to better manage my depression and substance abuse." Doc. #11-12 at 12. He dropped out of services again in December of 2007.

In August of 2008, plaintiff returned to Bryan Avenue Clinic to discuss his financial needs and his Social Security benefits application. Doc. #11-12 at 31. Plaintiff had been released from jail on August 11, 2008 after serving three months. Plaintiff appeared to have relapsed as he reported living with friends who were not doing things that were in his best interest. He seemed unhappy when he was told he had to be clean and sober and medication compliant before he could enter a housing program. Id. The following week, a psychiatrist at Bryan Avenue Clinic diagnosed him with major depressive disorder, recurrent, severe with psychotic features; cocaine dependence;

alcohol dependence; and intermittent explosive disorder. Doc. #11-14 at 27.

In October of 2008, plaintiff was again in jail and asked for medications, which at that time included Tegretol, Zoloft and Trazodone. In December of 2008, plaintiff went to the Wyandot Mental Health Center for treatment. He said that he had recently moved from Texas to Kansas to escape bad influences. Doc. #11-14 at 43. He reported that he had been without medication recently and was having some symptoms.

In February of 2009, Chester Day, M.D. evaluated plaintiff and diagnosed him with major depressive disorder and post-traumatic stress disorder. Doc. #11-15 at 12. Plaintiff reported that his mood was more stable now that he was able to maintain a supply of medication. He was taking Zoloft, Remeron, Trazodone and Tegretol.

In March of 2009, state agency psychological consultant Robert Blum, Ph.D. completed a Mental Residual Functional Capacity Assessment. Doc. #11-14 at 52-55. He opined that plaintiff is limited in ability to interact with the general public and to understand, remember and carry out detailed instructions. He found plaintiff not otherwise significantly limited. Dr. Blum contacted Dr. Day, plaintiff's treating psychiatrist, who told him that plaintiff's substance abuse issue was under control. Dr. Day indicated that plaintiff genuinely seemed to want to stay clean and sober. Dr. Day believed that plaintiff's biggest issue was back pain. Doc. #11-14 at 57.

In July of 2009, plaintiff continued to report no major periods of depression and a fairly good mood. Doc. #11-15 at 55. His mental status exam was completely normal.

In September of 2009, plaintiff returned to the Wyandot Center with concerns of being bipolar. He reported difficulty sitting still and being on the go constantly. Doc. #11-15 at 54. He reported going days without sleep and stealing from stores at least every other day. He reported

working in the yard for 14 hours straight and doing pushups for two hours at a time. The provider discontinued Tegretol and prescribed Zyprexa.

In November of 2009, Regina Carolina, M.D. evaluated plaintiff and diagnosed him with bipolar affective disorder. Doc. #11-15 at 52. Plaintiff had been off his medication for one week and had experienced increased anger outbursts and property destruction. He also reported doing increased yard work and cleaning, and only sleeping two to three days per week. Plaintiff reported that his last substance abuse was in 2007.

In March of 2010, Dr. Carolina evaluated plaintiff again. Doc. #11-15 at 57. He reported having more symptoms after he ran out of medication two weeks earlier. Overall, however, he reported that he was doing well and had not been acting on anger.

### D. Vocational Expert Testimony

Mary Ann Lumpy testified as a vocational expert. The ALJ asked her to consider the following hypothetical:

> [C]laimant can stand up [to] six hours a day. He can sit up to six hours a day. . . .
> never climb ladders, ropes or scaffolds. Occasionally stoop, kneel, crouch, or crawl.
> No work with the public. I'm going to say he can lift 20 at least in this first
> [hypothetical]. He can lift 20 pounds occasionally, 10 pounds frequently. Simple
> tasks only. And I'm going to say in addition that he should have a job that – in
> which he can perform it, essentially on his own. One that does not require a great
> deal of interaction in order to complete with other workers. . . . Subject to normal
> supervision. . . . [A]nd let me add a sit/stand option to this.

Doc. #11-4 at 82-83. Based on this hypothetical, Lumpy testified that plaintiff could perform jobs such as photocopy machine operator, microfilm processor, preparer/scanner, and surveillance systems monitor. Id. at 84.[5] The ALJ also asked Lumpy to consider the same hypothetical but with

---

[5]     Lumpy opined that 10,000 photocopy machine operator positions exist nationally with about 100 located in Kansas; that 13,000 microfilm processor positions exist nationally with
(continued...)

a plaintiff who needed to lie down during most of the day.  Based on this hypothetical, Lumpy

testified that plaintiff would not be employable.  Id. at 85.

## III. ALJ Findings

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2008.

2. The claimant has not engaged in substantial gainful activity since September 16, 2006 (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following impairments which are severe when considered in combination: disc space narrowing at L4-5 and L5-S1, major depressive disorder, intermittent explosive disorder, and alcohol and cocaine abuse, in possible current remission (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P Appendix 1 (20 CFR 404.1520(d), 404.1525,404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes, or scaffolds, can only occasionally stoop, kneel, crouch and crawl, cannot work with the general public, and requires a sit-stand option. The claimant is also limited to the performance of simple tasks in which he can essentially perform them on his own without a great deal of interaction and subject to normal supervision.

* * *

As for the opinion evidence, the undersigned gives the opinion of the claimant's treating psychiatrist, Dr. Day, significant weight as it relates to the claimant's mental assessment due to the treating relationship he has with the claimant regarding his mental impairments and the fact that his opinion is supported by his treatment records, and is also not inconsistent with the other substantial evidence in the case record. The opinion of the State agency psychological consultant is also given weight, as it is consistent with the record as a whole.

---

[5](...continued)
90 in Kansas.  Further, after accounting for a sit/stand option, she testified that 12,000 document preparer positions exist nationally with 90 in Kansas and that 75,000 surveillance system monitor positions exist nationally with approximately 100 in Kansas.

Regarding the claimant's physical impairments, the undersigned considers the opinion of consultative examiner Dr. Fishman and gives it considerable weight. However, the physical RFC opinion of the State agency single decision maker is given no weight. This opinion was not prepared by a medical consultant. Agency policy requires these opinions to be evaluated as adjudicatory documents only, and not accord them any evidentiary weight when deciding cases at the hearing level. However, Dr. Siemsen's affirmation of the RFC has been considered and is given some weight, although the undersigned finds no support in the record for the reaching limitation assessed.

Although the claimant alleged longstanding symptoms and medical treatment, a review of the case record revealed that he has not been entirely compliant with the prescribed medical care. As discussed above, he was discharged twice from mental health treatment services due to dropping out of service. He also had periods of gaps in both treatment and medication.

His noncompliance weighs against his credibility in alleging disability. In further evaluating the persuasiveness of the claimant's testimony, the undersigned finds the claimant's testimony was simply not consistent with other evidence in the file and thus, under the principle of *falsus in uno et falsus in omnibus*, [false in one, false in all] it is difficult to find the claimant credible in any regard. This was particularly the case with his drug and alcohol abuse. He testified at the hearing that he was injured while working as a CNA at the VA Hospital in 2003, and that it was only after his injury that he started abusing drugs and alcohol, and then only until he got treatment in 2005. He testified his last use of cocaine was on October 28, 2005. However, the record is full of evidence to the contrary.

* * *

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 4, 1968 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 16, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## IV.    Standard Of Review

The Court reviews the Commissioner's decision to determine whether it is "free from legal error and supported by substantial evidence." Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009); see 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Wall, 561 F.3d at 1052; Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). It requires "more than a scintilla, but less than a preponderance." Wall, 561 F.3d at 1052; Lax, 489 F.3d at 1084. Whether the Commissioner's decision is supported by substantial evidence is based on the record taken as a whole. Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994). Evidence is not substantial if it is "overwhelmed by other evidence in the record or constitutes mere conclusion." Grogan v. Barnhart, 399 F.3d 1257, 1261-62 (10th Cir. 2005). To determine if the decision is supported by substantial evidence, the Court will not reweigh the evidence or retry the case, but will meticulously examine the record as a whole, including anything that may undercut or detract from the Commissioner's findings. Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007).

## V.    Analysis

Plaintiff bears the burden of proving disability under the Social Security Act. Wall, 561 F.3d at 1062. Plaintiff is under a disability only if he can establish that he has a physical or mental impairment which prevents him from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least 12 months. Thompson v.

Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)); see also Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (quoting 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A)). Claimant's impairments must be of such severity that he is not only unable to perform his past relevant work, but cannot, considering his age, education and work experience, engage in other substantial gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step sequential process to evaluate disability. 20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). In the first three steps, the Commissioner determines (1) whether claimant has engaged in substantial gainful activity since the alleged onset, (2) whether he has severe impairment(s) and (3) whether the severity of any impairment meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). 20 C.F.R. § 404.1520; Williams, 844 F.2d at 750-51. If claimant satisfies steps one, two and three, he will automatically be found disabled; if claimant satisfies steps one and two but not three, he must satisfy step four.

At step four, the ALJ must make specific findings of fact at three phases: (1) claimant's RFC, (2) the physical and mental demands of prior jobs or occupations and (3) claimant's ability to return to his past occupation given his RFC. Wilson, 602 F.3d at 1139; Henrie v. U.S. Dep't of HHS, 13 F.3d 359, 361 (1993); Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir.1996). If claimant satisfies step four, the burden shifts to the Commissioner to establish that claimant is capable of performing work in the national economy. Jensen v. Barnhart, 436 F.3d 1163, 1168 (10th Cir. 2005); see 20 C.F.R. § 404.1520(a)(5).

Plaintiff argues that in assessing plaintiff's credibility, the ALJ erred when she (1) applied

the principle of *falsus in uno et falsus in omnibus* rather than careful analysis, (2) discounted

plaintiff's credibility based on noncompliance with medical treatment and (3) failed to evaluate the

testimony of plaintiff's fiancé, Tracy Bennett.

As noted, the ALJ must determine residual functional capacity based upon all the relevant

evidence, including medical records, observations of treating physicians and others, and the

claimant's own description of his limitations. As part of the residual functional capacity finding,

the ALJ must consider the credibility of plaintiff's subjective complaints. "Credibility

determinations are peculiarly the province of the finder of fact" and will stand when supported by

substantial evidence. Wilson, 602 F.3d at 1144. Therefore, courts usually defer to the ALJ on

matters involving witness credibility. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994); see

Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990) (courts generally treat as binding ALJ

credibility determinations).

The Tenth Circuit has explained the analysis for considering subjective testimony regarding

symptoms. Thompson, 987 F.2d at 1488 (dealing specifically with pain).

> A claimant's subjective allegation of pain is not sufficient in itself to establish
> disability. Before the ALJ need even consider any subjective evidence of pain, the
> claimant must first prove by objective medical evidence the existence of a
> pain-producing impairment that could reasonably be expected to produce the alleged
> disabling pain. This court has stated: The framework for the proper analysis of
> Claimant's evidence of pain is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir.
> 1987). We must consider (1) whether Claimant established a pain-producing
> impairment by objective medical evidence; (2) if so, whether there is a "loose nexus"
> between the proven impairment and the Claimant's subjective allegations of pain;
> and (3) if so, whether, considering all the evidence, both objective and subjective,
> Claimant's pain is in fact disabling.

Id. (further citations and quotation omitted).

For evaluating symptoms at step three of the framework, courts have set out a non-exhaustive

list of factors which include:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (quoting Thompson, 987 F.2d at 1489); see Luna, 834 F.2d at 165-66.

The Commissioner has promulgated regulations suggesting additional, somewhat overlapping factors: daily activities; location, duration, frequency and intensity of symptoms; factors precipitating and aggravating symptoms; type, dosage, effectiveness and side effects of medications taken to relieve symptoms; treatment for symptoms; measures plaintiff has taken to relieve symptoms; and other factors concerning limitations or restrictions resulting from symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

Plaintiff contends that the ALJ relied on an incorrect legal standard when assessing his credibility concerning his subjective complaints and his level of functioning. Specifically, plaintiff asserts that the ALJ improperly relied on the principle of *falsus in uno et falsus in omnibus,* i.e. "false in one thing, false in all," to the exclusion of any other credibility factors. Plaintiff's Brief (Doc. #12) at 15. Under this maxim, "if a witness testifies falsely as to any one material part of his testimony, his testimony should be discarded as a whole, and cannot be relied on for any purpose whatever, unless strongly corroborated." Phillip v. State, 225 P.3d 504, 511 (Wyo. 2010). Courts have criticized this concept, and some commentators have pronounced it "worthless." Id. at 511-12 (quoting IIIA John H. Wigmore, Evidence § 1008 (Chadbourn rev. 1970)) (maxim worthless because on one hand it contains kernel of truth but also is "absolutely false as a maxim of life").

Plaintiff asserts that the *falsus in uno* principle is not the correct legal standard for assessing credibility in a social security case, and that in any event, the ALJ's credibility analysis was insufficient.

In ruling on plaintiff's credibility, the ALJ did not simply rely on the principle of *falsus in uno et falsus in omnibus*. Rather, the ALJ cited this maxim as one part of her credibility analysis. In essence, she found that inconsistencies between plaintiff's testimony and other evidence undermined the credibility of plaintiff's subjective complaints. See Overton v. Astrue, No. 11-cv-00669-RBJ, 2012 WL 3288945 (D. Colo. Aug. 10, 2012) (ALJ may discount subjective complaints of pain based on inconsistencies in evidence as a whole). Here, the ALJ noted numerous inconsistencies between plaintiff's testimony and other evidence, as follows.

Plaintiff testified that he started abusing drugs and alcohol in 2003 and stopped using drugs after he got treatment in 2005. The record, however, contains substantial evidence to the contrary. On a Drug and Alcohol Use Questionnaire, plaintiff stated that he started using alcohol and drugs in 1990 and last used drugs in 1995 and alcohol in 1996. In the same Questionnaire, plaintiff indicated that he had received treatment for substance abuse in August of 2005. Further, in August of 2007, he told mental health professionals that he wanted help to "keep clean" and that he had the will to quit his cocaine use. Then, in August of 2008, he told staff at the Bryan Avenue Clinic that he had been running with friends and not doing things that were in his best interest and the staff told him he needed to be clean and sober to move into assisted housing. Tr. 508. The ALJ found that all of these facts pointed to plaintiff's continued drug abuse, and thus undermined his credibility.

Plaintiff asserts that other than the statements regarding his drug use, the ALJ failed to link any credibility factors to evidence in the record. Plaintiff also contends that the ALJ did not discuss

credibility with regard to the Luna factors and other considerations set out above. Indeed the ALJ did not specifically recite the Luna factors. But in assessing plaintiff's subjective complaints, she considered the factors, including objective medical evidence, daily activities, medication and the possibility that psychological disorders combined with physical problems are disabling.

The ALJ pointed out that no medical practitioner had opined that plaintiff has a condition that would preclude all work activity. Tr. 24; see Kelley v. Chater, 62 F.3d 335, 338 (10th Cir. 1995) (fact that "[n]o physician has opined that [a claimant] is disabled" is one factor in credibility analysis); see also Bridgeford v. Chater, 922 F. Supp. 449, 459 (D. Kan. 1995) (significant that none of plaintiff's physicians opined that plaintiff was incapable of sedentary work). The ALJ also noted that plaintiff received only conservative treatment for his back and had significant gaps in his treatment. See Campbell v. Bowen, 822 F.2d 1518, 1522 (10th Cir. 1987) (failure to seek consistent treatment factor in credibility analysis). Tr. 24, 597, 674, 802, 804.

Plaintiff asserts that the ALJ could not properly analyze noncompliance with treatment to discount his credibility without considering the factors in Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987). A Frey analysis is required, however, only if an ALJ denies benefits *solely* on the grounds that claimant failed to follow prescribed treatment. See Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). An ALJ may use plaintiff's failure to seek or follow treatment as one part of an overall credibility determination. Id. Here, the ALJ found that plaintiff's noncompliance with treatment weighed against his credibility in alleging disability. Although plaintiff asserts that any lapses in treatment were justified because he could not afford medication, the record supports a finding that plaintiff was non-compliant for other reasons. The ALJ's consideration of this evidence as part of her credibility finding was proper.

In addition, the ALJ noted that some of plaintiff's reported activities were inconsistent with his stated physical limitations and his reported need to lie down most of the day. Although plaintiff reported to mental health providers that he worked in the yard for 14 hours straight and stole from stores and could do push-ups for two hours at a time, he testified that he needed to lie down for most of the day due to his limitations. Throughout the analysis, the ALJ appropriately set out plaintiff's claims of specific limitations due to pain and then pointed to evidence that his limitations were less severe than he claimed.

Finally, plaintiff asserts that in assessing his credibility, the ALJ failed to consider lay witness testimony from his fiancé, Tracy Bennett, which corroborates his testimony. Social Security regulations provide that the Commissioner will consider opinion evidence from third parties when evaluating the credibility of a claimant's allegations of symptoms. 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4) (evidence provided by "other non-medical sources" such as spouses, parents, care-givers, relatives, friends or neighbors may be used "to show the severity of your impairment(s) and how it affects your ability to work"); 404.1529(c)(3), 416.929(c)(3) (in determining credibility of claimant's allegations of symptoms, Commissioner considers all evidence presented, including . . . observations by . . . other persons."); see SSR 06–03p; West's Soc. Sec. Rep. Serv., Rulings 327–34 (Supp. 2013) (in reaching disability decision, Commissioner must consider opinions of "other" non-medical sources such as spouses, parents, friends and neighbors).

In Blea v. Barnhart, 466 F.3d 903, 914 (10th Cir. 2006), the Tenth Circuit held that an ALJ must consider third-party testimony in reaching a disability decision. In Blea, plaintiff argued that remand was necessary because the ALJ failed to discuss or consider lay testimony of his wife. Id. The Commissioner's decision did not mention any details of her testimony, or mention that she had

testified regarding the nature and severity of plaintiff's impairments. Id. The Commissioner argued that the ALJ was not required to make written findings about each witness's credibility. Id. The Tenth Circuit ruled, however, that the ALJ is excused from making specific written findings of credibility only if "the written decision reflects that the ALJ considered the testimony." Id. at 915 (quoting Adams v. Chater, 93 F.3d 712, 715 (10th Cir. 1996)). The Tenth Circuit noted that the ALJ had not mentioned the wife's testimony or referred to its substance anywhere in the written decision, and concluded that it was "not at all clear" that the ALJ had considered her testimony. Id. The Tenth Circuit therefore remanded the case for the Commissioner to properly consider the wife's testimony. Id. Thus, as Judge John W. Lungstrum recently noted, "[t]he law in the Tenth Circuit is clear with regard to opinion testimony or statements from lay witnesses such as spouses, parents, friends, and neighbors." Dorrough v. Colvin, No. 12-2405-JWL, 2013 WL 4766804, at *10 (D. Kan. Sept. 4, 2013). The decision must reflect that the ALJ included the opinion in her consideration of disability, but she need not specify the particular weight accorded to that opinion. Id. Here, the ALJ written opinion did not mention the third-party testimony of plaintiff's fiancé. Thus, as in Blea, the Court remands the case for the Commissioner to consider Ms. Bennett's testimony.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **REVERSED**, and that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) **REMANDING** the case for further proceedings.

Dated this 30th day of September, 2013, at Kansas City, Kansas.

s/Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge